ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Direct Steel, LLC | ) ASBCA Nos. 63838, 63839 |
| | ) |
| Under Contract No. W9126G-21-C-0003 | ) |

APPEARANCES FOR THE APPELLANT:    Kendall Woods, Esq.
Mark Noth, Esq.
  Laurie & Brennan, LLP
  Chicago, IL

Mr. Matthew D. Nagel
  Vice President

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
R. Stephen Cheak, Esq.
R. Lauren Horner, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Fort Worth

OPINION BY ADMINISTRATIVE JUDGE MCLISH
UNDER BOARD RULE 12.3

Appellant Direct Steel LLC (Direct Steel) appeals "deemed denials" of two claims submitted to the government's contracting officer relating to a contract with the United States Army Corps of Engineers (USACE or government) to construct a warehouse at Fort Hood, Texas. We consolidated these appeals and Direct Steel elected to proceed under Board Rule 12.3, Accelerated Procedure. Both parties agreed to waive a hearing and submit their cases on the written record pursuant to Board Rule 11. Under Rule 12.3(c), the Board's decision "will normally be short and contain only summary findings of fact and conclusions."

## I.  The Contract

1.  USACE awarded Direct Steel Contract No. W9126G-21-C-0003 (Contract) on December 10, 2020.  The Contract was a firm-fixed price contract under which Direct Steel would construct a Supply Support Activity Warehouse at Fort Hood (now Fort Cavazos), Texas.  (JSF ¶¶ 2, 16-17)

## II.  Facts Relating to the Foundation Claim (No. 63838)

2.  Among the structures to be provided was a pre-engineered metal building (PEMB).  Direct Steel was to build the structural foundation to support the PEMB warehouse.  (JSF ¶¶ 3-5)

3.  The Contract set forth specific criteria for the PEMB.  The drawings included a fully designed and dimensioned structural foundation for an "example" PEMB.  The solicitation did not specify the brand or model of PEMB or covered storage structures to be constructed.  (JSF ¶ 5)

4.  Drawing S-002, under "Reinforced Concrete" at ¶ (C) n. 13 (Note (C)13), states:

> THE FOUNDATION SYSTEM HAS BEEN DESIGNED
> BASED ON ASSUMED PEMB COLUMN REACTIONS.
> FINAL PEMB COLUMN REACTIONS FROM THE
> PEMB SUPPLIER ARE REQUIRED TO VERIFY THE
> FOUNDATION DESIGN IS ADEQUATE.  THE
> CONTRACTOR SHALL OBTAIN THE SERVICES OF
> A LICENSED PROFESSIONAL ENGINEER TO
> VERIFY THE FOUNDATION SHOWN IS ADEQUATE
> FOR THE BUILDING SUPPLIED.  ANY REVISIONS
> TO THE FOUNDATION SHALL BE AT NO

---

[1] The parties submitted a 147-paragraph Joint Stipulation of Facts (JSF).  We accept the stipulated facts as true, although we do not repeat all of them here.  Our findings of fact rely upon the JSF as well as additional record evidence submitted by the parties, including documents in the Rule 4 file, affidavits, and expert reports.  We commend counsel for working together to prepare the JSF, which has been helpful to the Board.

ADDITIONAL COST TO THE GOVERNMENT, AND
SHALL BE SUBMITTED TO THE GOVERNMENT FOR
APPROVAL.

(JSF ¶ 58)

5. Direct Steel's president understood Note (C)13 of Drawing S-002 to mean that, if revisions to the foundation design were necessary, Direct Steel would provide them at no additional cost, but that Direct Steel would not be responsible for any increased cost of labor and material necessary to provide the foundation (app. br., ex. D (first aff. of R. Swierk) ¶ 12).

6. Direct Steel could not have determined whether and to what extent foundation revisions would be necessary until after contract award, when its selected PEMB supplier would complete the design of the PEMB building and provide column reactions (app. br., ex. D ¶¶ 5-9). In preparing its bid, Direct Steel assumed that the foundation design was adequate and did not include any contingency amount to account for the possibility that revisions to the foundation would prove necessary (app. reply, ex. 4 (second aff. of R. Swierk) ¶ 6). In light of the language in Note (C)13 of Drawing S-002, it was unreasonable for Direct Steel to assume that the foundation design was adequate.

7. USACE understood Note (C)13 of Drawing S-002 to mean that the contractor was responsible for all costs of providing a revised foundation if one became necessary because of the contractor's selection of a particular PEMB design. The government's administrative contracting officer's affidavit indicates that Note (C)13 of Drawing S-002 is standard in USACE contracts for PEMB warehouses throughout the world. He also testifies that he is personally familiar with three other PEMB projects that used the same specification and states that the contractors on those projects did not encounter the same foundation issues as Direct Steel. In his experience, contractors account for the labor and material cost of potential foundation revisions by allocating a contingency for this expense in their bids. (Gov't br., ex. B (aff. of C. Krause) ¶¶ 9-18)

8. A reasonably prudent contractor that decided to interpret Note (C)13 of Drawing S-002 as Direct Steel did would have recognized that the government could well interpret the language as requiring the contractor to absorb all costs, including construction costs, resulting from revisions to the foundation. Direct Steel did not seek clarification from USACE.

9. After contract award, Direct Steel selected a PEMB supplier and retained an engineer to assess whether the foundation set forth in the Contract would be adequate (JSF ¶¶ 80, 83). The engineer determined that the Contract-specified foundation

would require revisions to accommodate the PEMB Direct Steel had selected. The engineer concluded, and the government agrees, that the government's foundation design was insufficient to support the selected PEMB and had to be re-designed to add additional concrete for larger footings and additional reinforcing. (JSF ¶ 84; app. br., ex. B (aff. of C. Reising) ¶¶ 11-12)

10. Specifically, as Direct Steel informed USACE, "at the main building, additional reinforcing/cages were added at the PEMB columns. Also, at the three covered storage areas, the spread footings were changed from 8' square to 12' square (6 each building, 18 total). Both of these revisions were necessitated by inadequate uplift (-33k in design, -40k required, a 21% increase)" (R4, tab 11 at 2193). According to Direct Steel, "[t]he design loads reflected on [Drawings] S-001 and S-610 are not consistent with the foundation design per S-111- S-113." (R4, tab 13 at 2197)

11. Direct Steel paid for the preparation of the necessary revisions to the foundation design and the government approved them. (JSF ¶ 94; R4, tab 11 at 2193)

12. Direct Steel requested a modification to the Contract to increase the price to account for the additional costs of constructing the foundation made necessary by the revisions to the foundation design (JSF ¶¶ 86, 88, 91-92). The government declined to issue such a modification (JSF ¶ 88). Direct Steel successfully constructed the revised foundation and the PEMB (first R. Swierk aff. ¶ 19).

13. Direct Steel submitted a claim to the contracting officer seeking an equitable adjustment to the contract price to cover the additional costs of constructing the revised foundation. Direct Steel did not seek to be compensated for the cost of revising the foundation design. The contracting officer did not decide the claim and Direct Steel appealed the "deemed denial" of the claim to the Board. (JSF ¶¶ 95-98; R4, tab 13)

### III. Facts Relating to the Framing Claim (No. 63839)

14. While Direct Steel was in the process of installing the interior framing of the PEMB, USACE alleged that Direct Steel's framing installation did not conform to the Contract requirements in three respects:

> (a)    the metal studs for Wall Type 1S6x that exceeded 20 feet and 1 inch in height were thinner than required under the specifications;

(b)   the gypsum board installation lacked a double layer as indicated in Drawing AE-502 Detail 2, "Partition @ Roof"; and

(c)   the framing installation lacked bracing in accordance with Drawing S-321 Detail 1, Typical Top of Wall Lateral Support for Full Height Light Gauge Metal Stud Wall Partitions Parallel to Roof Purlins. and Detail 2, Typical Top of Wall Lateral Support for Full Height Light Gauge Metal Stud Wall Partitions Perpendicular to Roof Purlins.

(JSF ¶ 112)

15.  Direct Steel disagreed with the government's allegations.  USACE required Direct Steel to comply with USACE's interpretation of the requirements.  Direct Steel did so and incurred additional costs.

### a.  The Metal Studs Dispute

16.  The metal studs at issue are for one wall type specified in the Contract, specifically Wall Type 1S6x (JSF ¶ 52).  Type 1S6x walls were required to have 6-inch metal studs spaced 16 inches apart from each other from center to center (JSF ¶ 53).  Drawings AE-501, Partition Details, and AE-502, Partition and Ceiling Details, state at General Sheet Note 1 that "[a]ll assemblies to have 20 ga. studs with spacing of 16 [inches] O.C. unless otherwise noted" (JSF ¶ 54).

17.  The specifications required that the studs at issue comply with ASTM C645 (JSF ¶ 32).  ASTM C645 required that the six-inch studs at issue must have a minimum base steel thickness of 0.0296 inches or 30 mils (JSF ¶ 36).  ASTM C645 also states:

> Members that can show certified third party testing in accordance with ICC-ES-AC86 (Approved May 2012), and conform to the limiting height tables in Specification C754, need not meet the minimum thickness limitation set forth in subsection 4.3 or the minimum section properties set forth in subsection 8.1.

(JSF ¶ 37)

18.  The studs were also required to comply with ASTM C754 (JSF ¶ 30; R4 Tab 7 at 1151).  ASTM C754, Tables 3 and 4, provide that studs over 20 feet and one inch in length must be 0.0289 inches or 30 mils in thickness (JSF ¶¶ 40-41).

5

19.  Direct Steel's submittal for materials to be used during drywall framing included Clark Dietrich ProSTUD 20 Drywall Studs and included the Clark Dietrich product catalogue for those studs.  The catalogue indicates that the thickness of the Clark Dietrich ProSTUD 20 Drywall Studs is 0.0181 inches.  (R4, tab 16 at 2282-84)

20.  Clark Dietrich's product catalog claimed that its EQ 20-gauge stud performs like a conventional 20-gauge stud even though it has the same thickness as a 25-gauge stud.  It further states that it "[m]eets or exceeds ASTM C645 & C754", that it "complies with the SFIA Code Compliance Certification Program," that it has been certified by Underwriters Laboratories, and that is appropriate for use for "Unbraced Length (Lu)" of 23.6 inches.  (JSF ¶¶ 68-72)

21.  The Clark Dietrich EQ 20-gauge stud provided by Direct Steel does not strictly comply with the thickness requirements in ASTM C754, Tables 3 and 4, for 6-inch studs over 20 feet 1 inch in length.

22.  Direct Steel's submittal did not note any variations from the specified materials (JSF ¶ 100).  The Contract provides, with respect to approval of submittals: "[s]pecifically point out variations from contract requirements in transmittal letters.  Failure to point out variations may cause the Government to require rejection and removal of such work at no additional cost to the Government" (JSF ¶ 26).

23.  USACE approved the submittal without comments (JSF ¶ 101).  There is no evidence that the individuals who approved the submittal had the authority to waive the stud thickness requirements.  There is no evidence that the contracting officer, or anyone else with the authority to waive contract requirements, was aware that the proposed studs deviated from the requirements.  The Contract further provides that submittals are considered to be "shop drawings" (JSF ¶ 25) and that the contracting officer's approval of shop drawings does not relieve the contractor from responsibility for complying with the Contract's requirements (JSF ¶ 20).

24.  Direct Steel installed Clark Dietrich ProSTUD 20 Drywall Studs for Wall Type 1S6x until the government directed it to stop and to use compliant studs.  The administrative contracting officer ultimately did not require the replacement of every affected metal stud.  Instead, he required replacement only of the studs longer than 20 feet, 1 inch (aff. of C. Krause ¶¶ 23, 49).

### b.  The Gypsum Board Dispute

25.  The drawings have two details addressing the installation of partitions where they meet the metal roof deck, perpendicular to the roof purlins.  First, Detail 7 of Drawing AE-501 is entitled "Non-Rated Partition @ Roof (Typ)" (JSF ¶ 55).  Second, Detail 2 of Drawing AE-502 is entitled "Partition @ Roof (Typ)" (JSF ¶ 56).

This second detail indicates that it applies where the partition type meeting the roof deck is "GWB partition type as scheduled rated for fire or STC" (*id.*). "STC" refers to Sound Transmission Class. (*See* JSF ¶ 53).

26. The walls at issue were rated for STC (JSF ¶ 52). Accordingly, Detail 2 of Drawing AE-502 entitled "Partition @ Roof (Typ)," applies to the walls at issue.

27. Drawing AE-502 Detail 2, entitled "Partition @ Roof," provides for "2 LAYERS OF 5/8" TYPE X GYPSUM BOTH SIDES, OVER METAL FRAMING" and "FRAMING TO MATCH PARTITION BELOW" (JSF ¶ 56).

28. Direct Steel did not consider drawing AE-502, Detail 2 to be applicable and instead provided gypsum on only one side, following AE-501, Detail 7 (R4 tabs 18-19, 23-24). The government instructed Direct Steel to correct its installation to provide the required second layer of gypsum board in accordance with Detail 2 of Drawing AE-502 (JSF ¶ 112). Direct Steel proceeded to perform as the government directed, thereby incurring additional costs.

### c. The Bracing Dispute

29. Structural Drawing S-321, entitled "MISC PEMB COORD SECTIONS," contained Details 1, entitled "Typical Top of Wall Lateral Support for Full Height Light Gauge Metal Stud Wall Partitions *Parallel* to Roof Purlins," and Detail 2, entitled "Typical Top of Wall Lateral Support for Full Height Light Gauge Metal Stud Wall *Perpendicular* to Roof Purlins" (JSF ¶ 49) (emphasis added). Each of the details provided for "bridging within 8 [in] of top of metal studs @ 4'-0" O.C. vert. rest of wall, typ" (*id.*).

30. The government informed Direct Steel that the framing installation lacked bracing in accordance with Details 1 and 2 of Drawing S-321 (JSF ¶ 112)

31. Direct Steel took the position that Details 1 and 2 on Drawing S-321 did not apply to non-load-bearing wall types, and therefore, the depicted bridging did not apply. (JSF ¶ 116)

32. Nothing in the specifications or drawings indicates that Details 1 and 2 on Drawing S-321 applied only to load-bearing walls. It is undisputed that none of the interior partitions were load-bearing. (Gov't br. at 16; app. br. ¶ 11; app. reply at 18)

33. The government instructed Direct Steel to comply with the government's interpretation. Direct Steel notified the government that it considered this to be a change to the contract requirements and proceeded to perform as the government directed, thereby incurring additional costs. (JSF ¶¶ 117, 124-35)

#### d. Direct Steel's Submission of the Framing Claims

34. Direct Steel eventually submitted claims to the contracting officer seeking equitable adjustments to the contract price arising from the three framing issues (JSF ¶ 144). The contracting officer did not issue a decision on the claims and eventually informed Direct Steel that the claims were deemed denied (JSF ¶ 146).

35. Direct Steel appealed to the Board.

DECISION

## I. FOUNDATION CLAIM (No. 63838)

Direct Steel contends that the government's refusal to pay the additional construction costs resulting from the post-award changes to the foundation design entitles it to compensation in the amount of $96,887.88. It contends that its additional costs resulted from a defective design and that the Contract did not allocate the risk of such a design defect to the contractor.

The initial issue is one of contract interpretation. "Contract interpretation begins with the language of the written agreement." *OAA Md., LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1165-66 (Fed. Cir. 2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). "[T]he plain and unambiguous meaning of a written agreement controls." *Id.* (Quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002)). If the contract language is ambiguous, we may consider extrinsic evidence to resolve the ambiguity. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). If an ambiguity is not resolved by consideration of the contract as a whole and extrinsic evidence, then we resolve ambiguities against the party that drafted the contract, unless the ambiguity is so glaring that a reasonable contractor would seek clarification before bidding, in which case we construe the ambiguity against the non-drafting party if it did not make an appropriate inquiry. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1372 (Fed. Cir. 2009).

The foundation provision at issue, Note (C)13 on Drawing S-002, is best interpretated as requiring Direct Steel to bear the cost of any changes to the foundation that result from Direct Steel's selection of a particular PEMB over other available options. Direct Steel's interpretation, that it was responsible only for the costs of revising the design and not the costs of implementing them, is unsupported by the language of the provision and is not reasonable. The provision plainly and unambiguously requires the contractor to absorb the costs of "[*a*]*ny* revision to the foundation" resulting from the contractor's choice of PEMB supplier, not only the costs of revisions to the foundation design (finding 4) (emphasis added). Direct

8

Steel's interpretation would require USACE to compensate Direct Steel for potentially large amounts of foundation revision costs made necessary by the selection of a particular PEMB supplier, a decision that was solely Direct Steel's to make. It is unreasonable to assume that USACE would agree to take on this unknown liability, when only Direct Steel had the ability to influence the scope of the necessary foundation revisions. For these reasons, we interpret Note (C)13 as meaning that Direct Steel assumed the risk that it would incur additional costs if the foundation design required significant revisions.

Even if Direct Steel's interpretation were reasonable, it would have been obvious to a reasonably prudent contractor that the government's interpretation was also reasonable. Direct Steel, however, did not raise an inquiry with the government. Instead, it simply assumed that the USACE-provided foundation design would prove adequate, despite the clear warning in Note (C)13 to the contrary. (Findings 6, 8) Its interpretation, therefore, cannot prevail. *States Roofing*, 587 F.3d at 1372.

Direct Steel asserts that, on two other projects, USACE provided compensation to Direct Steel in "nearly identical circumstances" when USACE's foundation design proved to be inadequate for the final PEMB design (app. reply at 40). It has not demonstrated with adequate evidence, however, that the other situations were sufficiently similar that we should use that parol evidence in interpreting this Contract. Instead of providing the project documents that would show whether the circumstances are similar (or explaining why such documents are unavailable), it relies primarily on a second affidavit of its president submitted with its reply brief (second aff. of R. Swierk ¶¶ 7-11). Her general descriptions of the two other situations lack sufficient detail to establish a prior course of dealing that can properly be used to interpret Note (C)13 here. *See T&M Distribs., Inc.*, ASBCA No. 51405, 00-1 BCA ¶ 30,677 at 151,509.

Direct Steel contends that the government is nonetheless liable because the government-provided foundation design was inadequate for *any* PEMB on the market, and therefore the design was defective. In its view, Note (C)13 cannot reasonably be read to absolve the government of responsibility for changes to the foundation design resulting from design inadequacies that exist regardless of the particular PEMB Direct Steel elected to provide. We need not reach whether that interpretation is correct, however, because Direct Steel has failed to prove that the foundation design was inadequate for all available PEMBs.

Direct Steel's evidence consists of conclusory statements in affidavits from John Swierk and Charles Reising, the architect and engineer, respectively, who Direct Steel retained to verify that the USACE-supplied foundation design was adequate for the PEMB Direct Steel selected. These affiants, neither of whom Direct Steel asks the Board to recognize as qualified expert witnesses, do not state the bases for their

9

purported knowledge that no PEMB would be adequately supported by USACE's foundation design or what method they used to reach that conclusion. (*See* app. br., ex. C (aff. of J. Swierk) ¶ 17; aff. of C. Reising ¶ 15) Neither of them provides any explanation or analysis, and we find none in the record, that would allow the Board to assess Direct Steel's assertion that "the uplift design loads specified on Drawing S-001 and S-610 were not consistent with the foundation design indicated on Drawings S-111-S-113" (app. br. ¶ 83). Both also suggest, using virtually identical language, that the scope of the foundation revisions required here (i.e., the additional rebar cages and larger spread footings) were beyond what a contractor would typically expect (aff. of J. Swierk ¶¶ 18-20; aff. of C. Reising ¶¶ 16-18). Again, however, they do not explain the basis for these opinions. Thus, their testimony on these points lacks sufficient foundation to be credited by the Board. *See Trade West Constr., Inc.*, ASBCA No. 61068, 22-1 BCA 38,214 at 185,601 ("It is well established that '[g]eneralized conclusory, unsupported opinion type statements do not demand weight when such statements are little more than self-serving conclusions.'") (Quoting *L.B. Samford, Inc.*, ASBCA No. 32645, 93-1 BCA ¶ 25,228 at 125,660); *Universal Yacht Servs., Inc.*, ASBCA No. 53951, 04-2 BCA ¶ 32,648 at 161,579 ("Expert opinion evidence is not entitled to weight when 'there is simply too great an analytical gap between the data and the opinion proffered'") (quoting *General Electric Co. v. Joiner*, 522 U.S. 136,146 (1997).

Moreover, there is credible evidence contradicting Direct Steel's contention that the foundation design was not adequate for any potential PEMB, in the form of the administrative contracting officer's testimony that no such issue arose on the three other PEMB projects with which he is personally that used the same specification (finding 7). We conclude that Direct Steel has failed to carry its burden of proof as to this contention.

Finally, Direct Steel argues that the government could not properly use Note (C)13 on Drawing S-002 to disclaim responsibility for deficiencies in its foundation design. While general disclaimers of liability by the government may be unenforceable in certain situations, *see Metcalf Constr. Co. v. United States*, 742 F.3d 984, 996 (Fed. Cir. 2014), here the exculpatory language is quite specific, being limited to foundation revisions necessitated by the contractor's selection of a particular PEMB. "A contractor may not prevail on a defective specifications claim when it has assumed the risk of performance, such as when the government uses specific—as opposed to general—exculpatory language." *RLB Contracting, Inc.*, ASBCA No. 62779, 23-1 BCA ¶ 38,374 at 186,411.

Accordingly, Direct Steel has failed to demonstrate that it is entitled to additional compensation for costs incurred in implementing the foundation design revisions.

## II. FRAMING CLAIM (No. 63839)

Direct Steel contends that it incurred additional costs complying with the government's directions relating to the wall partitions and that the government must compensate it for those costs in the amount of $99,637.98.

## A. Metal Studs

USACE has demonstrated that the initial metal studs that Direct Steel installed did not comply with the Contract's requirements. The specifications unambiguously require the studs at issue to have a minimum thickness of 0.0289 inches, per ASTM C756, Tables 3 and 4. The studs Direct Steel provided were 0.0181 inches thick. (Findings 18-19) Accordingly, under the unambiguous terms of the contract, the studs were non-compliant.

Direct Steel argues that its studs were acceptable because they were "equivalent" or "EQ" studs. While the manufacturer claims that its 25-gauge studs perform as well as a conventional 20-gauge stud despite being thinner, under the terms of this Contract the contractor is not entitled to install materials that vary from the specifications based on its judgement that they are just as good as those specified. *See In Re Valenzuela Eng'g, Inc.*, ASBCA Nos. 53608, 53936, 04-1 BCA ¶ 32,517 at 160,853. The government was entitled to insist upon strict compliance with the contract specifications and to require correction of nonconforming work. *Sauer, Inc.*, ASBCA No. 61847, 21-1 BCA ¶ 37,939 at 184,270-71.

The interpretation offered by Direct Steel's expert witness is not persuasive, for at least three reasons. First, contract interpretation is a matter of law. Second, his opinion is based on his wholly unsupported assertion that the thickness requirement set out in Tables 3 and 4 of ASTM C754 for studs longer than 20'1" apply only to "conventional" studs and not to "equivalent" studs like the Clark Dietrich product, and thus may be disregarded in favor of different tables appearing in Clark Dietrich's product literature. Third, he asserts without sufficient basis that the appearance of the Underwriters Laboratories classified mark—which apparently means a product has been evaluated for a specific hazard or for performance under specific conditions—on Clark Dietrich's product literature means that all of Clark Dietrich's claims about its product are true.[2] (*See* app. br., ex. A (report of R. Schmidt) at 5-7; app. reply, ex. 1 (rebuttal report of R. Schmidt) at 1-3)

---

[2] To the extent that the expert and Direct Steel are suggesting that the studs complied because they met the exception in ASTM C645 for studs that "can show certified third party testing in accordance with ICC-ES-AC86 (Approved May 2012), and conform to the limiting height tables in Specification C754," they are incorrect because the studs did not conform to Tables 3 and 4 in ASTM C754 (finding 18).

11

The time for Direct Steel to make its case that the Clark Dietrich studs were the functional equivalent of studs meeting the length limitations set out in ASTM C754, Tables 3 and 4, and therefore should be permitted, was before it began installing them. The Contract provided at least one mechanism for the contractor to seek approval of a product that varies from the strict requirements, which was to specifically note the variation in its submittal so the contracting officer could consider it. Direct Steel did not do that. While it may have been evident from the product information included in the submittal that the studs were thinner than required but claimed to be equivalent, the contract required Direct Steel to specifically note any deviations from the contract requirements. The notice requirement ensures that deviations are brought to the attention of the contracting officer, generally the only person with the authority to waive contract requirements. Therefore, in the absence of evidence that the contracting officer was otherwise on notice that the product Direct Steel submitted deviated from the required thickness of the metal stud, the government's approval of the submittal cannot be construed as an approval of the deviation or a waiver of the contract requirements. *See GSC Constr., Inc.*, ASBCA, Nos. 59402, 59601, 21-1 BCA ¶ 37,751 at 183,225 (government approval of erroneous shop drawings does not shift the risk of error to the government).[3]

Accordingly, Direct Steel is not entitled to an equitable adjustment to compensate it for additional costs it incurred installing compliant metal studs in the areas directed by USACE.

### B. Gypsum Board

Direct Steel claims that that the contract required only one layer of gypsum board where the gypsum partitions met the metal roof deck, because AE-502, Detail 2 did not apply and, instead only AE-501, Detail 7 applied. We disagree. Drawing AE-501, Detail 7 applies where the partition meeting the roof deck is "non-rated." The government has demonstrated that Drawing AE-502, Detail 2 applies where the partition meeting the roof deck is "rated for fire or STC". Because the gypsum partitions at issue were STC-rated, Drawing AE-502, Detail 2 applies (finding 26). Direct Steel's interpretation is not reasonable and therefore these provisions are not ambiguous.

Again, although this contract interpretation issue is one of law, we have considered the opinion of Direct Steel's expert witness. His opinion that AE-502,

---

[3] Although Direct Steel does not argue that the "economic waste" doctrine applies, we note that the government ultimately decided to require strict compliance only for those walls longer than 20 feet, 1 inch (*see* aff. of C. Krause ¶ 23). That, and the absence of adequate proof that the Clark Dietrich studs were substantially compliant, indicates that the doctrine does not apply here. *Sauer, Inc.*, ASBCA No. 61847, 21-1 BCA ¶ 37,939 at 184,271-72.

Detail 2 does not apply is not persuasive because it ignores the indication in that detail that it applies where the partition type meeting the roof deck is "GWB partition type as scheduled rated for fire or STC" (finding 25).

Accordingly, Direct Steel is not entitled to an equitable adjustment to compensate it for the cost of complying with the double-layer requirement in the areas where the government directed it to do so.

## C.  Bracing

This dispute centers on whether Drawing S-321, Details 1 and 2, apply to the walls at issue.  Direct Steel contends they do not because those details appear on a structural drawing and therefore apply only to load-bearing walls.  Because the walls at issue were not load-bearing, it argues, no bracing was required.  The government contends that those details apply to all partitions that reach the roof, regardless of whether they are load-bearing, and therefore bracing was required.  We agree with the government.

Direct Steel's contention that Details 1 and 2 do not apply to non-load-bearing walls has no support in the drawings or specifications.  By their titles, they apply to "FULL HEIGHT LIGHT GAGE METAL STUD WALL PARTITIONS," with Detail 1 applying to those that are parallel to the roof purlins and Detail 2 applying to those that are perpendicular to the roof purlins (finding 29).  Further, Drawing S-321 is entitled "MISC PEMB COORD SECTIONS," which suggests that it is not restricted to those portions of the PEMB that are structural.  In addition, Direct Steel's interpretation would render the two details in question superfluous, because it is undisputed that none of the full-height light-gauge metal stud wall partitions required for this project were load-bearing (finding 32).  An interpretation that leaves portions of the Contract meaningless is disfavored.  *NVT Techs.*, 370 F.3d at 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."); *see also M.A. Mortenson Co.*, ASBCA No. 50716 *et al.*, 99-1 BCA ¶ 30,270 at 149,688 (rejecting interpretation that would render superfluous a construction drawing detail); *Custom Concept Builders of Conn., Inc.*, ASBCA No. 25671, 81-2 BCA ¶ 15,358 (same).

Accordingly, Direct Steel is not entitled to an equitable adjustment to compensate it for the cost of complying with the bracing requirement in the areas where the government directed it to do so.

**D. Breach of Good Faith and Fair Dealing**

Direct Steel's claim that the government breached the implied duty of good faith and fair dealing also fails. To the extent Direct Steel contends that the government breached the implied duty by asserting incorrect interpretations of the contract provisions at issue, that claim is without merit because we have concluded that the government's interpretations were correct.

Direct Steel contends that USACE breached the implied duty by failing to timely respond to its requests for equitable adjustment and to issue contracting officer's final decisions on its claims. Direct Steel has not shown that USACE's conduct "interfere[d] with the other party's performance [or] destroy[ed] the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *see also WSP USA Solutions, Inc.*, ASBCA No. 62674, 22-1 BCA ¶ 38,219 at 185,629. Nor has it shown that it suffered any compensable damages from the alleged breach. *See Swinerton Builders Northwest*, ASBCA, No. 57329, 17-1 BCA ¶ 36,738 at 179,042.

<u>CONCLUSION</u>

Having considered all of appellant's contentions, we find that the claims lack merit. Accordingly, the appeals are denied.

Dated: August 2, 2024

THOMAS P. McLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63838, 63839, Appeals of Direct Steel, LLC, rendered in conformance with the Board's Charter.

Dated:  August 5, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals