# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Lockheed Martin Services, Inc. ) | ASBCA Nos. 58028, 58794 |
| ) | |
| Under Contract No. MDA220-01-D-0002 ) | |

APPEARANCE FOR THE APPELLANT:  Joseph J. Dyer, Esq.
   Seyfarth Shaw LLP
   Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Regina M. DelaRosa, Esq.
 April M. Breck, Esq.
  Trial Attorneys
  Defense Finance & Accounting Service
  Indianapolis, IN

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

Lockheed Martin Services, Inc. (LMSI), appeals from the Defense Finance & Accounting Service (DFAS) contracting officer's (CO's) decisions denying LMSI's claim for $1,140,462.56 in additional costs and asserting DFAS' claim demanding the return of a license fee of $799,089.39. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We sustain LMSI's appeals.

## FINDINGS OF FACT

1. DFAS awarded Contract No. MDA220-01-C-0002 (Contract 0002), effective 28 September 2001, to ACS Government Solutions Group, Inc. (ACS), for the performance of the Defense Retired/Annuitant Pay System (DRAS) (R4, DVD-A, tab C-0002 at PDF 1 of 189). On 13 March 2006 the contract number was changed to MDA220-01-D-0002 (R4, DVD-A, tab D-0002 at PDF 1 of 259).

2. Contract section C, Description and Specifications, Performance Work Statement (PWS) (R4, DVD-A, tab C-0002 at PDF 31, 85 of 189), includes the following relevant paragraphs:

## 7.0 GOVERNMENT-FURNISHED PROPERTY AND SERVICES

### 7.1 Government Furnished Property and Services

The government will provide the property, facilities, materials, and services described in Section J-4 and proposed by the contractor. The contractor shall maintain accountability of all accepted Government property and shall comply with all applicable policy and guidance regarding its use.

....

#### 7.1.2 Defense Retired/Annuitant Pay (DRAS) Automated Information System (AIS)

If the contractor uses the Government-furnished DRAS AIS, the DRAS software technical data rights thereto, and data files, as updated, shall be returned to DFAS at the completion of the performance period.

#### 7.1.3 Facilities

The government will provide the facilities described in Section J.4 and proposed by the contractor in the current "where-is/as is" configuration. The Contractor will utilize, to the extent possible and most efficiently to DFAS, the existing facilities, equipment and software of DFAS. Government furnished facility space will remain subject to space allocation policies prescribed in applicable property management regulations....

....

#### 7.1.4 Equipment

The government will provide the "where-its/as-is" equipment listed in Section J-4. The contractor shall be responsible for all maintenance, repair, and replacement of all accepted government equipment. The contractor shall maintain custody of the material and return the material to the government at the end of its useful life or at the termination of the contract.

....

**8.0 Contractor-Furnished Services and Materials**
If the contractor uses an AIS other than DRAS, the contractor shall make available to DFAS, or its agents, licenses for continued use of the AIS following the expiration or termination of the contract. Such license shall be made available at the most favorable terms, prices, and conditions provided to any other customer of the contractor. The contractor is responsible for providing all property, materials, and services except as provided in Section J-4.

(R4, DVD-A, tab C-0002 at PDF 46-47 of 189)

3. Contract section H – Special Contract Requirements, contains the following relevant clauses:

**H.8 REFRESH OF DEFENSE RETIRED/ ANNUITANT PAY SYSTEM TECHNOLOGY**

If the contractor proposes the Defense Retired/Annuitant Pay System (DRAS) to perform the requirements and during performance determines it is more efficient to refresh the DRAS technology and change the system configuration, the contractor shall submit a proposal to the contracting officer for consideration. The contracting officer and contractor shall negotiate the terms and conditions of the agreement and process the change as a contract modification. Refresh of DRAS Technology is not considered to be routine or normal maintenance to sustain system operability.

....

**H.10 VENDOR PROPRIETARY TECHNOLOGY**

The contractor shall (a) obtain prior written approval from the Contracting Officer Representative (COR) prior to using contractor or third party proprietary technology to perform the services; and (b) provide, upon the Government's request, at no additional cost, a perpetual, irrevocable, non-exclusive, world-wide, royalty-free

3

license to install, use, copy, modify and incorporate into DFAS' proprietary and licensed systems, any of the contractor and third party proprietary technology that the contractor used in providing services to DFAS; provided that clause (b) will not apply to software, code or modifications which are generally commercially available on reasonable terms.

(R4, DVD-A, tab C-0002 at PDF 58, 61-62 of 189)

4. Contract section J – List of Documents, Exhibits, and Other Attachments, includes the following:

## Section J.4

## GOVERNMENT-FURNISHED PROPERTY AND SERVICES

....

**J.4.3. GOVERNMENT-FURNISHED EQUIPMENT (GFE).** If the contractor proposed to utilize specific items of GFE, the government will furnish and/or make available items described in the contractor's technical proposal in an "as is, where is" condition. The contractor's proposal's description of specific items of GFE is incorporated herein.[1]

**J.4.3.1. REPLACEMENT OF GOVERNMENT-FURNISHED EQUIPMENT.** Should any item of government-furnished equipment require replacement, the contractor shall be responsible for such replacement at no cost to the government.

**J.4.3.2. GFE INVENTORIES.** In conjunction with the transfer of responsibility for pay services operations during the base period of the contract, specific items of government–furnished equipment will be jointly inventoried. A joint GFE inventory will be accomplished during each contract option

---

[1] The proposal lists only Cleveland and Denver facilities with "equipment" "existing property as is" (R4, tab 66 at 0998).

4

period, and a final joint inventory will be made upon contract termination or expiration of any contract period during which the contractor has not received notice of exercise of a contract option....

**J.4.3.3. GFE MAINTENANCE.** The government will not maintain or repair GFE. All GFE is provided on an "as is, where is" basis. The contractor shall be responsible for maintenance of Government-Furnished equipment for its useful life.

**J.4.3.4. REPLACEMENT OF GFE.** The government will not replace GFE; GFE is offered on a one-time, "as is, where is" basis at the outset of contract performance. If GFE items require replacement the contractor shall be responsible for such replacement at no cost to the government.

....

**J.4.5. USE OF GFE, GFP,[2] AND GFS.** Use will be limited to that required for the performance of tasks in the PWS.

**J.4.6. LIST OF PROPERTIES, FACILITIES, MATERIALS AND SERVICES OFFERED BY THE GOVERNMENT**

**GOVERNMENT FURNISHED PROPERTY**

DRAS Automated Information System

[List of DRAS hardware and software omitted]

(R4, DVD-A, tab C-0002 at PDF 106-09 of 189)

*Mail Imaging Routing and Optical Reporting System*

5. Prior to Contract 0002 DFAS performed the DRAS function itself using government-owned hardware and software known collectively as the Mail Imaging Routing and Optical Reporting System, "MIRORS." In its 23 January 2001 proposal for

---

[2] Government-Furnished Property (R4, DVD-A, tab C-0002 at PDF 81 of 189).

5

this contract ACS stated it planned to replace MIRORS with ACS Intelligent Queue (IQ) (supp. R4, tab 67 at 1155). ACS explained that replacing MIRORS with ACS IQ would result in a net savings from a reduction in staff (*id.*). After contract award, DFAS provided ACS Government-Furnished Equipment in the form of computers, data bases and the MIRORS system. MIRORS converted incoming mail to digital images and distributed them within ACS as needed. (Tr. 1/34) ACS commenced performing using MIRORS. When ACS started performing, MIRORS was ten years old and it was recognized that it was behind current technology (tr. 1/36). MIRORS hardware experienced increasing failures and the manufacturer of the "SAN tower," Hewlett Packard, would no longer provide maintenance (tr. 1/37).

6. Both parties agree that the contract did not require that ACS replace MIRORS (gov't reply br. at 2; app. br. at 4). By letter dated 29 April 2003 to Ms. Kleinknecht, DFAS contracting officer, ACS stated it intended to replace the MIRORS with a new system using the latest technology. ACS stated:

> It is our intent to attach a Functional Requirements Document ("FRD") of the high-level requirements for the MIRORS, upon DFAS' concurrence as required by section H.5 of the prime contract. A copy of the FRD is provided for your review and approval....
>
> ....
>
> ACS will submit a detailed proposal to DFAS, in accordance with Section H.8, to negotiate the terms and conditions for data transfer, use and licenses to third party software, continuity of services, and ownership of the system at contract termination.

(R4, tab 69 at 1258) The record does not contain evidence of a response to this letter by CO Kleinknecht or anyone else at DFAS (tr. 1/44). Both parties agree that ACS asked DFAS if it would pay for the development of the MIRORS replacement and DFAS refused (gov't reply br. at 2; app. br. at 5; tr. 1/42; gov't ex. C at 2264-65).

7. By email dated 6 May 2003, at DFAS' request, ACS sent CO Kleinknecht a copy of a draft MIRORS System Replacement Statement of Work (SOW). The SOW explained that the MIRORS system was "eleven years old and the hardware and software are obsolete." (R4, tab 70 at 1335, 1337)

8. LMSI purchased ACS in early 2004 (tr. 1/33, 38). LMSI determined that ACS' IQ system would not work as a replacement for MIRORS and decided to develop its own (tr. 1/58-60). By letter dated 1 June 2004 Mr. Vittori, LMSI's contracts administrator,

6

notified Mr. Peter Joyce, DFAS contract specialist, that LMSI intended to replace MIRORS with an internal LMSI Corporation product, with terms and conditions to be addressed later (tr. 1/130-32; R4, tab 71 at 1344). The replacement was based on the E-STARS system that was customized for the retired and annuitant pay system (tr. 1/38). E-STARS was an integrated system that used third party software "knitted together" using LMSI proprietary code (tr. 1/44-45). The replacement system was referred to as "RAPID" (tr. 1/41). LMSI began transitioning to RAPID in December 2004 (tr. 1/50). In the letter Mr. Vittori refers to ongoing discussions between LMSI and DFAS and a presentation "on E*Stars that will address functional capabilities, DRAS interface approach, and requisite terms and conditions" (R4, tab 71 at 1344). DFAS' refusal to pay for the replacement of MIRORS and the fact that MIRORS was failing "drove LM to define and purchase a replacement, entirely funded by LM" (gov't ex. C at 2264). RAPID software was never added to the contract by modification (*id.* at 2265).

9. By email dated 26 July 2004 to Mr. Joyce, Mr. Vittori wrote:

> FYI – major issue with MIRORS. We cannot process work unless it is manual. We are accessing situation and will be back in touch with risk mitigation. Debra has been briefed by Jim. We are expediting the E*Stars as fast as possible. I likely will be asking for relief on J-1 measures if the situation with this GFE system does not improve quickly.

(R4, tab 76 at 1388)

10. By internal DFAS email dated 6 August 2004, Mr. Joyce wrote:

> The original contract assumed this happening (ACS proposed later in the contract life to provide a replacement, its "ACS Intelligent Queue (IQ)sm" system, and from my conversations with LMGS it will be a cost they pick up in full. There is a caveat in a sense that when we get to the end of the contract and if LMGS is not awarded the follow on there may be a need to purchase usage rights to the E-Stars replacement, but really that would depend on how a follow on might be worded.

(R4, tab 78 at 1391) Later that same day Mr. Joyce sent out another internal email where he wrote:

> This is really representative of the problem with this contract. I'd think that those managing it as CORs and

7

COTRs would be monitoring situations such as this so if it came to be (as it has here), that we had a system that was simply breaking down due to age (the hardware replacements are no longer manufactured) that we would have a few options, or would have thought about a few options. But since we are spending so much time on repetitive oversight and because we believe "where is – as is" also means "if it is falling apart it[']s not our problem now" we end up with this scenario. There is absolutely no foresight, no vision, no thought as to what might happen tomorrow. I'd really liked to have had a better idea of how bad this was.

(R4, tab 78 at 1391)

11. Appellant's RAPID system received all of its required approvals and was implemented in December 2004 (R4, tab 89 at 1441, *see also* tab 53 at 590). Mr. Vittori was asked on cross-examination if "RAPID is generally commercially available upon reasonable terms" and he responded, "No" (tr. 1/208). Mr. Vittori testified that to his knowledge, RAPID has not been sold to third parties (*id.*).

*DFAS Decides to Bring DRAS Back In-House*

12. In about April 2009 DFAS decided not to exercise any remaining contract options and to return to performing the pay services itself (tr. 1/131). It exercised contract line item number (CLIN) 0052, Transition Out Period (R4, DVD-A, tab D-0002 at PDF 101 of 259), and asked LMSI for a transition plan (R4, tab 92 at 1511). By email dated 11 August 2009, Mr. Vittori submitted a revised proposal for contract transition (tr. 1/132; R4, tab 10). LMSI proposed a price of $3,074,514.15 for RAPID as follows:

**Part 3- RAPID**

| | |
|---|---|
| RAPID Baseline Value | $1,513,132.92 |
| RAPID Third Party Software–UPDATE | $ 341,094.04 |
| RAPID Hardware–Refresh | $ 694,781.22 |
| Enhancements to Base | $ 525,505.97 |
| SUBTOTAL | $3,074,514.15 |

(R4, tab 10 at 144)

13. By email dated 2 September 2009 to Mr. Miller, DFAS contract specialist, Mr. Vittori provided a licensing agreement, dated 28 October 2002, between LMSI and Fluor Hanford, Inc. (Hanford), to explain "the parameters related to ownership and

8

development of E-Stars" (R4, tab 15 at 197, 200). The license provides that the Department of Energy (DOE) owns the copyright to E-STARS and that Hanford, acting as DOE's agent, grants to LMSI "a nontransferable, exclusive license to copy, market, distribute and service E-STARS for commercial purposes" (*id.* at 200). The license specifically provides that DOE retains ownership of E-STARS but that LMSI retains ownership of "derivative works including improvements, additions and/or upgrades to E-STARS" developed by LMSI at its private expense (*id.* at 200-01).

*DFAS Requests DCAA Audit*

14. DFAS requested a DCAA audit of LMSI's transition proposal. By email dated 8 September 2009 to Ms. Clark, DCAA, Mr. Miller, DFAS, stated:

> Just to clarify, the request [for audit] only pertains to part 3 of the proposal, not the entire proposal. Specifically, DFAS is trying to ascertain that LM is only proposing the costs to develop RAPID and has not included profit. The costs to develop RAPID are allowable according to clause H.10 below.

(R4, tab 16 at 204) Mr. Miller was stating DFAS' interpretation of H.10 at that time (tr. 2/196). CO Minnich, DFAS (tr. 2/115), agreed with this email and explained that he interpreted the words "at no additional cost" in H.10 to allow for the payment of the cost to develop RAPID and then DFAS would have the right to a no-cost license (tr. 2/137-38). CO Minnich was persuaded that LMSI had not billed nor been paid for the development of RAPID (*id.*). CO Minnich would not allow profit because H.10 used the term "costs" and cost does not include profit (tr. 2/139). Mr. Vittori also recalled that CO Minnich believed that LMSI's cost to develop RAPID was allowable (tr. 1/142-43). CO Minnich did not consider H.8 when arriving at his first interpretation of H.10 because RAPID was not part of DRAS (tr. 2/189).

*Tentative Agreement on Price for RAPID*

15. Mr. Vittori recalled a 20 October 2009 meeting he attended with Mr. Jim Egeland, LMSI program manager, Mr. Doug Smith, DFAS project office lead, and CO Miller,[3] DFAS (by phone) (tr. 1/137-38). CO Miller recalled the 20 October 2009 meeting/conference call and testified that Mr. Smith and Mr. Egeland started "haggling" over the purchase price for RAPID and agreed on $2.6M. CO Miller did not participate in the "haggling" and agreement on price. He did not agree to the price. (Tr. 2/196-98) At the end of the meeting CO Miller stated that DFAS would have to provide information that

---

[3] Sometime before this meeting Mr. Miller was apparently elevated from contract specialist to contracting officer.

would allow him to determine that the $2.6M was fair and reasonable (tr. 2/200). Mr. Vittori testified that the $2.6M was less than LMSI's proposal and did not include profit (tr. 1/139). He also recalled CO Miller added the caveat about reasonableness at the end of the meeting (tr. 1/139-40). He testified that the $2.6M included the initial development, enhancement, third party software and hardware, what he referred to as "one bundled price" (tr. 1/140).

*The 20 November 2009 DCAA Audit*

16.  The results of DCAA's 20 November 2009 audit were summarized as follows:

| Element of Cost | Proposed Costs | Questioned Costs | Unsupported Costs (Note 2) | Difference (Note 1) | Notes |
|---|---|---|---|---|---|
| Enhancements (Labor) | $ 255,319 | $ - | $ - | $ 255,319 | 3 |
| Other Direct Costs: | | - | - | - | |
|   Original Investment | 1,276,608 | 911,727 | - | 364,881 | 4 |
|   Third Party Software | 287,776 | - | 31,617 | 256,159 | 5 |
|   Hardware Refresh | 586,177 | - | 43,136 | 543,041 | 5 |
| Material | 543,746 | | 543,746 | - | 6 |
| Overhead | 168,766 | - | - | 168,766 | 7 |
| Subtotal | $3,118,392 | $ 911,727 | $ 618,499 | $1,588,166 | |
| Product Line Works-Civil | 28,321 | 10,029 | - | 18,292 | 8 |
| Total Cost Input | $3,146,713 | $ 921,756 | $ 618,499 | $1,606,458 | |
| G&A | 171,275 | 62,877 | - | 108,398 | 9 |
| Total Costs | $3,317,988 | $ 984,633 | $ 618,499 | $1,714,856 | |
| Profit | 300,272 | | | | 10 |
| Total Price (FFP) | $3,618,260 | | | | |

(R4, tab 29 at 272)  There are differences between the numbers in the transition proposal, part 3 (finding 12), and the above table that are not explained in the record.  We use the numbers in the audit, which we consider the most accurate.

17.  Ms. Clark, DCAA lead auditor (tr. 1/210), explained that "[q]uestioned costs" are costs that DCAA received evidence for, but not enough for DCAA to "say [the] costs were okay" (tr. 1/221).  Unsupported costs are costs for which DCAA did not receive any supporting evidence (*id.*).

18.  Exhibit B is LMSI's cost proposal that was audited by DCAA (tr. 1/86-87). Exhibit B includes an amortization table that identifies monthly payments totaling $2,300,624 spread over June 2005 through November 2011 charged to project code

DFFR0D[4] (gov't ex. B at 2155). Mr. Jablonowski testified that the $2,300,624 "was the original cost of RAPID done by the Hanford site" (tr. 1/73). The monthly amortization amounts between June 2005 and November 2011 were payments out of LMSI's profit on Contract 0002 to pay for the $2,300,624 original development cost of RAPID done at Hanford (tr. 1/73-74; gov't ex. B at 2155). The $1,276,607.89 listed in the audit was calculated by subtracting the $1,024,016 value of items "that were not in service and use in operation" from the $2,300,624 original cost of RAPID (tr. 1/75; gov't ex. B at 2003).

19. Ms. Clark testified she looked at the labor charged to RAPID between 2004 and 2009 that is summarized on exhibit B at page 2134 (tr. 1/223). Contrary to Ms. Clark's testimony, Mr. Jablonowski testified that the labor data seen on exhibit B, at page 2134, was for all Hanford labor for 2004 to 2009 regardless of scope, not just for RAPID (tr. 1/78-79). Hanford did all of the work developing and enhancing RAPID (tr. 1/38, 71), but that was not the only work Hanford did. Exhibit B identifies $1,021,276.41 in Hanford labor costs[5] from 2004 to 2009 (tr. 2/29-30; gov't ex. B at 2134). Hanford estimated that 25% of that labor was for enhancements to RAPID (tr. 1/79-80). The $255,319 enhancement labor in the DCAA audit is based on 25% of $1,021,276.41 (.25 x $1,021,276 = $255,319) (tr. 1/225, 2/20-21). Mr. Jablonowski verified that the $255,319 was for labor at Hanford relating to enhancements of RAPID (tr. 1/71-72; gov't ex. B at 2001). Ms. Clark testified that because the $255,319 was calculated based on a 25%[6] estimate DCAA could not audit the actual number and therefore questioned the entire amount (tr. 1/226).

20. Mr. Zeuke also worked on the 20 November 2009 audit (tr. 2/62). He evaluated the Other Direct Costs/Original Investment amount of $1,276,608 (tr. 2/63-64). He agreed with Mr. Jablonowski that the $1,276,608 was calculated using the amortization table for the RAPID (R4, tab 55 at 684) and LMSI's "shelved or no longer used or a future use value cost associated with the original investment" (tr. 2/64-65). The amortization table shows amortization of $2,300,624 for RAPID (tr. 2/65; R4, tab 55 at 684). The value of the shelved items was $1,024,016 (tr. 2/66; gov't ex. B at 2002-03). Therefore, $2,300,624 - $1,024,016 = $1,276,608 is the number for original investment on the summary table in the audit (tr. 2/66). Note 4 in the audit explains why DCAA questioned the $911,727, "we question $911,727 of the contractor's $1,276,608 RAPID Original Investment amount, based on a recalculation of the asset's book value at the date of the start of the period of performance for this task order/contract" (R4, tab 29 at 274). Mr. Zeuke explained that the $911,727 in Questioned Costs

---

[4] DFFR0D is a code associated with Contract 0002 (tr. 2/106-97; R4, tab 29 at 6).

[5] Ms. Clark testified that they verified that LMSI was charging the correct labor rates—DCAA did not find any discrepancies to what they were charging based on their books and records (tr. 1/227).

[6] There is no labor code for RAPID™ enhancement which is why they used an engineering estimate of 25% for enhancement labor (tr. 1/121-22).

11

"represents the amount of the original investment that would have been amortized and charged to the contract up until the period of performance begins for the new proposal which was February of 2010"[7] (tr. 2/67; R4, tab 29 at 272, 274). The $364,881 was the unamortized remainder. Mr. Zeuke agreed that he did not question that LMSI actually incurred the $911,727 (tr. 2/68).

21. Mr. Zeuke testified that he believed that LMSI had been paid for RAPID's "original investment" cost:

> In the case of the original investment, that was a business decision by Lockheed to develop this system to meet the requirements of their fixed price contract and it was considered as part of their pricing.

(Tr. 2/84)

*LMSI's Position on H.10*

22. Although it is unclear from the record what LMSI was responding to, by email dated 31 December 2009 to CO Minnich, Mr. Vittori presented LMSI's position on Clause H.10 and RAPID. Mr. Vittori took the position that H.10 did not apply to RAPID because DFAS had never paid LMSI for the development of RAPID, had never modified the contract to incorporate RAPID into the contract and because RAPID was a commercial product. (Tr. 1/146-47; R4, tab 99 at 1570-71)

23. By email dated 21 January 2010 to Mr. Vittori, CO Minnich stated, "While we agree that a price agreement was reached at $2.6M, I have to have an adequate basis for the award, technical support could not provide support for the agreed to price, and for all the reasons we previously discussed H.10 applied to RAPID" (R4, tab 36 at 322; tr. 1/165-66).

*LMSI's Certification*

24. By email dated 9 December 2009 to CO Minnich, Mr. Vittori stated, "An area of audit concern seems to be the $911K of 'questioned' costs. As I stated yesterday, we can certify that all costs have not been charged or claimed since that is the basis as to why DCAA challenged that amount." (R4, tab 33 at 295; tr. 1/156-57) Mr. Vittori recalled that CO Minnich agreed that LMSI incurred the $911,727; his concern was that they had somehow been paid that amount (tr. 1/158-59).

---

[7] The $911,727 was calculated by multiplying $1,276,608 by the ratio of the accumulated depreciation for February 2010 ($1,643,058.58) to the total depreciation ($2,300,624) (*see* R4, tab 55 at 684).

12

25. By email dated 26 January 2010 to CO Minnich, Mr. Vittori provided a draft certification with attached financial data (amortization table) that he offered to sign to support the fact that LMSI had not been paid the $911,727 questioned in the DCAA audit (tr. 1/170-72; R4, tab 37). Mr. Vittori ultimately signed[8] the certification and submitted it to DCAA on 30 June 2010 (tr. 1/176; R4, tab 9; gov't ex. C at 2332-35). The certification reads:

> In response to DCAA Exception Note 4 of audit report No. 6271-2009B21000015 [November 20, 2009], LM has reviewed the $911,727 of costs and these costs are in relation to the original RAPID™ investment baseline installed in 2004. These costs were charged to an internal account to capture costs that are non-reimbursable (code DFFR0D). We have verified that this specific account code is one that does not generate an invoice and have confirmed that these costs have not been previously billed or charged to DFAS or other US Government entity.
>
> Based on the above analysis, LM certifies that, to the best of our knowledge and belief, the cost data submitted in support of the Lockheed Martin Proposal for RAPID™ [dated August 5, 2009] was based on actual incurred costs, accrued and booked in the Lockheed Martin Services, Inc. accounting system and although they may not reflect all costs incurred toward the product support and development, they are current, accurate and complete regarding the LM internal project RAPID™ in accordance with FAR Part 15. [Brackets in original]

(R4, tab 9)

*Modification No. P00089*

26. On 8 January 2010, CO Minnich issued unilateral Modification No. P00089 (R4, tab 3 at 15; tr. 1/123). In his transmittal letter to LMSI he stated that LMSI was entitled to just compensation under H.10 for RAPID cost, which was included in the modification, based upon the amount the DCAA audit substantiated. He noted that LMSI could seek different terms through a request for equitable adjustment or the contract's disputes provisions. (R4, tab 35 at 301-02)

---

[8] The certification date of 5 August 2009 is incorrect because the certification states it is in response to the 20 November 2009 audit (R4, tab 9).

27.    Unilateral Modification No. P00089 paid LMSI a total of $1,459,537.44 as follows:

> User License:  $779,089.39
> Hardware:      $485,626.09
> Software:      $194,821.96
> Total:         $1,459,537.44

(R4, tab 3 at 16)  The $1,459,537.44 was calculated by reducing the $1,714,856 in the audit's Total Costs "Difference" column by the audit's "Enhancements (Labor)" of $255,319 because this was based on a 25% estimate (tr. 2/132-33; R4, tab 29 at 272; ex. A, column A).  The $485,626.09 was calculated by "straight line ten year" depreciation ($57,415) of the $543,041 in the audit's Hardware Refresh "Difference" column (tr. 2/131-32; R4, tab 29 at 272; ex. A, block C11).  The $194,821.96 was calculated by reducing the audit's $256,159 in the Third Party Software "Difference" column by $61,337 for software not in use (tr. 2/132; R4, tab 29 at 272; ex. A, block C12). The $779,089.39 User License is simply the difference between Total Costs and the sum of depreciated Hardware Refresh and adjusted Third Party Software:  $1,459,537.44 - ($485,626.09 + $194,821.96) = $779,089.39 (tr. 2/133; ex. A, column B)  Profit was not paid because CO Minnich interpreted Clause H.10 to preclude profit (tr. 2/134).

28.    Unilateral Modification No. P00089[9] added DFAS Local Clause 2010-01, Price Redetermination–RAPID, which provided for either an increase in the contract amount or a decrease and repayment to the government.  The clause stated in part:

> (a) *General.*  The total price stated in this contract may be redetermined in accordance with this clause and clause H-10...but in no event shall the total amount paid under this contract exceed $2,600,000.00.
>
> ....
>
> (c) *Data Submission...*
>
> ....

---

[9] Effective 19 February 2010 Modification No. P00089 was replaced in its entirety by unilateral Modification No. P00091, executed by CO Miller.  The modifications are identical except for the name of the contractor.  (R4, tab 4 at 38 *et seq.*)  We will use P00089 in this decision.

...If it is later determined that the Government has overpaid the Contractor, the excess shall be repaid to the Government immediately.

(d) *Price determination.* Upon the Contracting Officer's receipt of the certified cost and pricing data required by paragraph (c) of this section, the Contracting Officer and the Contractor shall promptly negotiate to redetermine fair and reasonable prices for supplies delivered and services performed by the Contractor under this contract.

....

(g) *Disagreements.* If the Contractor and the Contracting Officer fail to agree upon redetermined prices...the Contracting Officer shall promptly issue a decision in accordance with the Disputes clause.

(R4, tab 35 at 304-05)

29. By email dated 21 January 2010 to Mr. Vittori, CO Minnich writes:

While we agree that a price agreement was reached at $2.6M, I have to have an adequate basis for the award, technical support could not provide support for the agreed to price, and for all the reasons we previously discussed H.10 applied to RAPID.

...The $911K has not been adequately documented. The statement you provided in supporting the $911K affirms the position that these charges were not billable, but your statement does not rise to a level of cost or pricing data certification as proscribed in FAR 15.406. I still do not understand the basis for the $911K. Also beyond meeting the specific issue identified by the Audit, I also have to overcome the overall remark by the auditor that they found the proposal unsuitable for a basis for negotiations.

(R4, tab 36 at 322-23)

30. By email dated 26 January 2010 to CO Minnich, Mr. Vittori submitted "support for DFFROD" in the form of an amortization table and profit and loss statement (R4, tab 55). The amortization table shows that the $2,300,624 original expense was

amortized each month from June 2005 through November 2011 in the amount of $27,582.06 (June 2005 to July 2008) and $31,312.64 (August 2008 to November 2011) (tr. 2/104-05; R4, tab 55 at 684). On 7 April 2010 CO Minnich forwarded the documents to CO Miller stating, "Here is additional documentation showing that the LM investment for RAPID against non-chargeable accounts meets and exceeds the amount of the agreed to value/cost of RAPID" (R4, tab 55 at 682).

*The License Agreement*

31. Mr. Vittori and CO Minnich signed a software license agreement for RAPID on 27 and 28 January 2010 respectively (tr. 2/124; R4, tab 38 at 337). The license granted DFAS a "perpetual, irrevocable, non-exclusive, world-wide, royalty-free license to install, use, reproduce, modify and integrate the Product [RAPID] into your DFAS proprietary and licensed systems" (R4, tab 38 at 333; tr. 1/54-55). Mr. Vittori and CO Minnich did not put in a price for the license because they did not agree on the amount (tr. 1/203; R4, tab 38 at 334). The payment clause (paragraph 6) simply directs that DFAS agrees to pay the fee specified in Modification No. P00089 (R4, tab 38 at 334).

32. Mr. Vittori recalled attending an "in-person" meeting in Cherry Hill, New Jersey, on 3 August 2010 with DCAA to discuss RAPID (tr. 1/191-92). The record contains a "Summary Rapid Meeting 8-3-10" in bullet format apparently written by Ms. Clark,[10] DCAA (R4, tab 44). One bullet reads, "We questioned how LMSI paid for RAPID since it was not a part of the original bid – they claimed to have borrowed profit & that they amortized it over time, RAPID was paid over time with LMSI's profit" (*id.*).

*Certified Claim*

33. On 19 July 2011, LMSI submitted[11] a certified claim to CO Miller requesting that the contract price be raised pursuant to the price redetermination clause from the $1,459,537.44 authorized by Modification No. P00089 to the full capped amount of $2,600,000, for a claimed amount of $1,140,462.56 (R4, tab 53 at 587, 601).

34. By final decision dated 21 December 2011, CO Miller denied LMSI's claim (R4, tab 63). The decision reads in part:

> IV. Contracting Officer's Decision:
> Clause H.10 requires LMSI to provide DFAS a
> "perpetual, irrevocable, non-exclusive, world-wide,
> royalty-free license" to "install, use, copy, modify

---

[10] A box on the bottom of the document indicated "Auditor JLC" and one of the attendees was Jamie Clark of DCAA (R4, tab 44).

[11] Sent by email (R4, tab 53 at 587).

16

and incorporate" RAPID into DFAS's systems "at no additional cost." Therefore, LMSI must provide the license to DFAS for an amount equal to LMSI's actual costs to develop RAPID. LMSI has argued that its actual costs to develop RAPID exceed $2,600,000.00, so DFAS should increase CLIN 0065 to the not-to-exceed amount of $2,600,000. However, DFAS is unable to validate LMSI's claimed costs because LMSI did not properly account for the development costs at the time the costs were incurred. Therefore, the DFAS Contracting Officer has determined that the original obligated price of $1,459,537.44, based on and supported by the DCAA audit, is the final purchase price for the RAPID license, and will not increase the price to the not-to-exceed amount of $2,600,000 as LMSI has demanded in its certified claim.

(R4, tab 63 at 856-57)

35. On 15 March 2012 LMSI appealed the 21 December 2011 final decision to the ASBCA. On the same day the Board docketed the appeal as ASBCA No. 58028.

*DFAS's Motion for Partial Summary Judgment*

36. On 1 October 2012, DFAS filed a motion for partial summary judgment asking the Board to decide that LMSI was not entitled to any license fee for its use of RAPID. On 20 February 2013 the Board issued its decision finding that since there was no final decision demanding the return of the license fee of $779,089.39 the Board lacked jurisdiction to consider the motion. *Lockheed Martin Services, Inc.*, ASBCA No. 58028, 13 BCA ¶ 35,244.

*DFAS Demands the License Fee Back*

37. Unilateral Modification No. P00092, signed by CO Minnich on 6 May 2013, was issued to "correct modification P00091" (we use P00089 in this decision) to reduce the $779,089.39 license fee to zero and stated that LMSI was indebted to DFAS in that amount (supp. R4, tab 124 at 1690). Modification No. P00092 did not change Modification No. P00089's allowance of $485,626.09 for hardware and $194,821.96 for software. CO Minnich previously interpreted H.10 to allow him to pay for the cost of RAPID since Mr. Vittori insisted that LMSI had not been paid for RAPID (tr. 2/117-18, 120). However, CO Minnich now believes that he was mistaken because RAPID was a "replacement" for GFE/MIRORS and that it does fall within H.10 (tr. 2/121-22,

17

2/180-81). Modification No. P00092 was issued in final decision format with appropriate appeal rights stated (supp. R4, tab 124 at 1692).

38. On 18 July 2013, LMSI appealed the final decision to the ASBCA. On 25 July 2013 the Board docketed LMSI's appeal as ASBCA No. 58794.

## DECISION

LMSI replaced DRAS AIS (MIRORS) with RAPID which it developed and enhanced at its own expense. DFAS now performs DRAS work using LMSI's RAPID system but for the reasons discussed herein contends it is not obligated to pay for it. In its appeals LMSI asks that this Board require DFAS to pay it $1,140,462.56 for RAPID, the unpaid amount remaining in the $2.6M cap it agreed to and reflected in Modification No. P00089.

Resolution of this appeal requires the Board to interpret clauses in contract Sections C (PWS), H, and J. DFAS relies on section J.4.3.1, Replacement of Government-Furnished Equipment, for the proposition, "There can be no question that Appellant's replacement of MIRORS with RAPID was the replacement of GFE, which was to be done as part of the Contract price" (gov't br. at 17-18). DFAS assumes, without any analysis of contract language, that the DRAS AIS is GFE. DFAS interprets H.10 Vendor Proprietary Technology, to require LMSI to provide it with a license to use RAPID at no additional cost (gov't br. at 18-19). LMSI chooses to focus on Modification No. P00089 arguing that DFAS is attempting to improperly rescind its agreement to pay for RAPID (app. br. at 14-18). We disagree with both parties' arguments.

*DRAS AIS is Not GFE*

PWS paragraph 7.1.4, with respect to GFE, states that the GFE for the contract is as listed in section J.4 of the contract (finding 2). Section J.4.3 does not list the GFE but instead states that the specific items of GFE shall be as stated in the contractor's proposal (finding 4). The contractor's proposal does not list any specific items of GFE (fn. 1). Moreover, section J.4.6 identifies the item that the government now alleges is GFE as GFP (finding 4). It is clear that the contract distinguishes between GFE, GFP and GFS (finding 4). We cannot accept the government's interpretation. Alternatively, because there is some confusion in terminology in the contract, if we were to continue to interpret the various relevant clauses in the contract the result would not be different. We consider PWS, paragraph 7, Government-Furnished Property and Services (finding 2). We take particular notice of which subparagraphs of PWS paragraph 7 refer to contract section J.4, Government-Furnished Property and Services.[12] Paragraph 7.1, Government-Furnished Property and Services, states that the government "will provide the property, facilities,

---

[12] We note that WBS paragraph 7 and contract section J.4 share the same title.

18

materials, and services described in Section J-4" (*id.*). Subparagraph 7.1.2, Defense Retired/Annuitant Pay (DRAS) Automated Information System (AIS), states that if the contractor uses "Government-furnished DRAS AIS" that it will return the updated data files to DFAS at the end of the contract. Importantly, this subparagraph does not refer to contract section J.4. (*Id.*) Subparagraph 7.1.3., Facilities, states that the "government will provide the facilities described in Section J.4 and proposed by the contractor in the current 'where-is/as is' configuration" (*id.*). Subparagraph 7.1.4, Equipment, states that the government "will provide the 'where-is/as-is' equipment listed in Section J-4" (*id.*). It is significant that DRAS AIS in paragraph 7.1.2 is separate and distinct from "*Equipment*" in subparagraph 7.1.4. We conclude from this that DRAS AIS is not "equipment."

Now we turn to contract section J, List of Documents, Exhibits, and Other Attachments. Subparagraph J.4.3., Government-Furnished Equipment (GFE), states that the government will furnish GFE "in an 'as is, where is' condition" (finding 4). Subparagraph J.4.3.1., Replacement of Government-Furnished Equipment, states that replacement of government-furnished equipment is the contractor's responsibility at no cost to the government (*id.*). This is the provision DFAS relies upon to support its argument it should receive RAPID at no cost. Subparagraph J.4.3.2., GFE Inventories, states that GFE will be "jointly inventoried" (*id.*). Subparagraph J.4.3.3., GFE Maintenance, again provides that GFE is provided "as is, where is" and that maintenance is the responsibility of the contractor (*id.*). Subparagraph J.4.3.4., Replacement of GFE,[13] again states that GFE is provided "as is, where is" and any required replacement is the responsibility of the contractor at no cost to the government (*id.*). Significant is the total absence of any mention of DRAS AIS in subparagraph J.4.3. Also, subparagraph J.4.5., Use of GFE, GFP, and GFS, makes a distinction between "GFE," "GFP" and "GFS" (*id.*). The contract defines "GFE" as "government-furnished equipment" and "GFP" as "government-furnished property" but curiously does not define "GFS"[14] (*id.*). In interpreting contract language we must read the contract as a whole. *NVT Technologies, Inc. v. United States,* 370 F.3d 1153 at 1159 (Fed. Cir. 2004) (When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.). We therefore read PWS section 7 in harmony with contract section J.4.3 to reach our interpretation. Because (1) DRAS is listed as GFP in paragraph J.4.6.; (2) DRAS AIS in PWS paragraph 7.1 is not "equipment"; (3) PWS subparagraph 7.1.2, Defense Retired/Annuitant Pay (DRAS) Automated Information System (AIS), does not refer to contract section J.4.; and (4) the DRAS AIS is not referenced in contract section J.4.3., Government-Furnished Equipment (GFE), we conclude that DRAS AIS is not GFE. Therefore, DFAS' argument that DRAS AIS is GFE and must be replaced at no cost is unpersuasive.

---

[13] This appears to be a duplicate of paragraph J.4.3.1.

[14] Since section J.4 refers to government furnished property and services, we surmise the "GFS" stands for government-furnished services but have no way of determining if "GFS" includes MIRORS.

19

*Contract Clause H.10 Does Not Require LMSI to Give DFAS a No-Cost License*

Next we consider the proper interpretation of contract clauses H.8, H.10 and PWS 8.0 (findings 2, 3). Initially CO Minnich interpreted H.10 to allow for reimbursement of the cost of developing RAPID. However, he interpreted H.10 standing alone; he did not consider the relationship between H.8, PWS 8.0 and H.10. (Finding 14) We consider CO Minnich's initial interpretation to be correct.

Clause H.8 requires that the contractor start performance using DRAS: "If the contractor proposes the Defense Retired/Annuitant Pay System (DRAS) to perform the requirements" (finding 3). DRAS is MIRORS (finding 5). Next H.8 deals with the situation where during performance the contractor decides DRAS needs to be "refreshed" to "change the system configuration" (finding 3). Clause H.8 envisions the contractor submitting a proposal for the change to DFAS and the parties would "negotiate the terms and conditions" of a contract modification if DFAS allows LMSI to "change the system configuration" (*id.*). We interpret "negotiate the terms and conditions" to mean that LMSI would be paid for said change.

PWS 8.0 applies when "the contractor uses an AIS other than DRAS" (finding 2). We interpret this to mean the replacement of DRAS AIS. PWS 8.0 envisions a paid license for the new AIS, "[s]uch license shall be made available at the most favorable terms, prices, and conditions provided to any other customer of the contractor" (finding 2). The difference between H.8 and PWS 8.0 is that H.8 provides for an unspecified payment and PWS 8.0 provides for a paid license. We conclude that PWS 8.0 and H.8 do not conflict because H.8 does not prohibit payment from taking the form of a license. Both, however, envision payment for a replacement of DRAS AIS.

Clause H.10 requires LMSI to provide "at no additional cost" a license if DFAS gives LMSI "written approval" to use "contractor or third party proprietary technology to perform the services" (finding 3). The free license afforded by H.10(b) "will not apply to software, code or modifications which are generally commercially available on reasonable terms" (*id.*). RAPID is a combination of DOE owned E-STARS software and LMSI owned derivative software (finding 13). Mr. Vittori testified that RAPID had not been sold commercially (finding 11). We conclude that RAPID is not "generally commercially available on reasonable terms" and the exclusion in H.10 does not apply.

We again follow the well known rules of contract interpretation that require us to favor an interpretation that gives meaning to all parts of the contract. *NVT Technologies*, 370 F.3d at 1159 (An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.). If we were to interpret H.10 to require a free license to use RAPID as DFAS argues, we create a direct conflict between H.8, PWS 8.0 and H.10. H.8 provides

that DFAS would pay LMSI for RAPID, whereas H.10, according to DFAS, gives DFAS the right to a free license to use RAPID. There is obviously no reason for DFAS to pay for RAPID if it had the right to use it for free. DFAS' interpretation renders H.8 superfluous. PWS 8.0 provides for a paid license whereas H.10, according to DFAS, provides for a free license – a direct conflict rendering PWS 8.0 superfluous if we adopt DFAS' interpretation.

To avoid conflicts and give reasonable meaning to H.8, PWS 8.0 and H.10, we interpret H.8 to allow payment for the replacement of the existing DRAS and H.10 to apply to (1) the introduction of "proprietary technology" but while still using DRAS AIS (MIRORS) or (2) to a replacement AIS paid for under H.8. The words in H.10 "at no additional cost," are consistent with our interpretation that DFAS would pay for RAPID under H.8. and then receive a free license under H.10. PWS 8.0 fills in the gap and provides for a paid license if DFAS has not paid for RAPID under H.8. This interpretation avoids the conflicts discussed above, harmonizes H.8, PWS 8.0 and H.10, is reasonable and does not render H.8 or PWS 8 superfluous. *FSEC, Inc.*, ASBCA No. 49509, 99-2 BCA ¶ 30,512 at 150,665 (an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous, nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible). Since we interpret H.10 to apply in situations where the DRAS is not replaced or a replacement is paid for under H.8, it does not apply to RAPID. Under this interpretation, DFAS is not entitled to a free license to use RAPID.

*Modification No. P00089 and the $2.6 Million Cap*

DFAS allowed LMSI to develop and implement RAPID, but did not exercise its discretion to negotiate payment under H.8[15] (findings 5-9). Clause H.8 bestows upon DFAS the discretion to do this, "the contractor shall submit a proposal to the contracting officer for *consideration*" (finding 3) (emphasis added). It is clear from the record that MIRORS was obsolete and needed replacement (findings 9, 10). LMSI made the decision to replace MIRORS at its own expense in order to successfully perform the contract (finding 8). RAPID was implemented commencing in December 2004 (finding 11). LMSI performed the contract using RAPID for five years until DFAS decided to bring the work back in-house (finding 12).

After DFAS decided to bring DRAS back in-house in 2009, LMSI submitted a transition proposal in the amount of $3,074,514.15 comprised of: RAPID Third Party Software $341,094.04; RAPID Hardware–Refresh $694,781.22; RAPID Baseline Value

---

[15] The first notice by ACS that it intended to replace MIRORS invoked H.8 as authority for negotiation of "terms," including ownership of the replacement system at contract termination (finding 6).

$1,513,132.92; and Enhancements to Base $525,505.97 (finding 12). DCAA conducted an audit of LMSI's proposal (findings 14, 16-20). At this time CO Minnich interpreted H.10 to allow DFAS to pay for the cost of developing RAPID (findings 14, 26). CO Minnich and LMSI reached tentative agreement on a payment for the cost of development of RAPID of $2.6 million subject to support that the amount was fair and reasonable (findings 23, 29).

CO Minnich issued unilateral Modification No. P00089 agreeing to pay LMSI $1,459,537.44 for RAPID (finding 27). The modification included the $2.6 million cap (*id.*). The $1,459,537.44 was the amount substantiated by the DCAA audit and adjusted downward by DFAS (finding 16). Modification No. P00089 allowed: Software $194,821.96; Hardware $485,626.09; and User License $779,089.39 (findings 28, 34). Modification No. P00089 provided that the $1,459,537.44 could be redetermined[16] to allow up to the full $2.6 million cap or a repayment if LMSI was found to have been overpaid (findings 27, 28). After Modification No. P00089, LMSI and DFAS entered into a license for RAPID (finding 31). The license did not include the license fee because the parties did not agree on what that fee would ultimately be (*id.*).

*The $779,089.39 Was Not an Overpayment*

In 2013 CO Minnich changed his interpretation of H.10. He now believes that he was mistaken because RAPID was a "replacement" for DRAS and pursuant to H.10 DFAS was entitled to a free license (finding 37). On 6 May 2013, CO Minnich issued unilateral Modification No. P00092, to recoup the $779,089.39 license fee for RAPID he allowed in unilateral Modification No. P00089 (*id.*). Modification No. P00092 recited that it was issued to "correct modification P00091" (P00089) (*id.*).

The correctness of Modification No. P00092 hinges on if the $779,089.39 was an overpayment. It was not. DFAS' overpayment argument is based on its belief that it is entitled to a royalty free license for RAPID pursuant to H.10. Our interpretation discussed above concluded that H.10 does not apply to RAPID. Therefore, the government is not entitled to the $779,089.39 demanded in Modification No. P00092.

*LMSI has not been Paid for RAPID*

DFAS agreed to pay up to $2.6 million for RAPID in Modification No. P00089; LMSI accepted that cap on its recovery (finding 28). LMSI's certified claim for $1,140,462.56 (finding 33) is the difference between the $1,459,537.44 paid in

---

[16] In its argument that DFAS cannot "rescind" Modification No. P00089 to recover the $779,089.39 license fee LMSI overlooks this provision that allows the government to reopen Modification No. P00089 to make corrections for overpayments (app. br. at 16-18).

Modification No. P00089 and $2.6 million cap. In his final decision denying LMSI's claim, CO Minnich stated that while the $1,459,537.44 was supported by the DCAA audit, the audit did not support an additional payment and "DFAS is unable to validate LMSI's claimed costs because LMSI did not properly account for the development costs at the time the costs were incurred" (finding 34). The issues for the Board to decide are did LMSI incur up to the additional $1,140,462.56 to develop and enhance RAPID and if so, has it been paid?

MIRORS was obsolete and required replacement (findings 7, 9-10). LMSI's Hanford organization did all of the development and enhancement work on RAPID (findings 19, 20). The development work was performed before December 2009 when RAPID was deployed (finding 11). The costs to develop RAPID were allocated to project code DFFR0D that was a non-reimbursable account (findings 17, 25, 30). The original development cost of RAPID was $2,300,624 (findings 18-20). LMSI paid Hanford the $2,300,624 out of its Contract 0002 profits. This was done on a monthly basis between June 2005 and November 2011 that is documented on an amortization table. (Finding 30) The amortization table is important because DFAS used it to question development costs in its audit (finding 20 n.6). DFAS does not contest that LMSI incurred the $2,300,624 (findings 19-20).

The original investment number in the DCAA audit summary is $1,276,608. This was arrived at by subtracting $1,024,016 for out-of-service items from the $2,300,624 original investment (findings 19-20). Since both appellant's witness, Mr. Jablonowski (finding 18), and the government's witness, Mr. Zeuke (finding 20), accepted this reduction as correct, we accept it.

In its audit, DCAA questioned $911,727 of the $1,276,608 original investment (findings 16, 20). The $911,727 was the amount of the $1,276,608 amortized through February 2010 (finding 20 n.6). DCAA found that LMSI incurred the $911,727 (*id.*). DCAA questioned the costs because it believed that the amortized costs had been charged to Contract 0002 (findings 20-21). The basis for DCAA's belief that the amortized amount of $911,727 was charged to the contract is not explained in the record. If it is based on DFAS' position that DRAS AIS is GFE and contract clause J.4.3.1. required LMSI to replace GFE at no cost to DFAS (gov't br. at 17-18), we found that interpretation to be wrong above. Mr. Zeuke also testified that the original investment of RAPID "was a business decision by Lockheed to develop this system to meet the requirements of their fixed price contract and it was considered as part of their pricing" (finding 21). Mr. Zeuke's testimony is unsupported by the record and based on a legal interpretation of H.10 that Mr. Zeuke is not competent to offer. LMSI submitted a signed certification to DCAA on 30 June 2010 stating that the $911,727 had never been billed to the government or otherwise paid by the government (finding 25). This certification is unrebutted by DFAS. We conclude that LMSI has not been paid the development costs for RAPID.

23

The record contains a listing of labor costs at Hanford from 2004 through 2009 in the amount of $1,021,276.41 (findings 19-20). Ms. Clark audited these costs and verified their accuracy (*id.*). The $255,319 enhancement cost was based on Hanford's estimate that 25% of its work after RAPID was deployed was for enhancement (finding 20). The $255,319 was not "questioned" in the audit summary, but was subtracted from the amount paid to LMSI by Modification No. P00089 because DCAA could not audit an estimate (findings 16, 19). The validity of the 25% estimate is unrebutted by DFAS. We see no reason why Hanford cannot reasonably estimate the labor it spent on enhancements to RAPID and we accept the 25% and the $255,319 as the amount incurred by LMSI for enhancements to RAPID. Under these circumstances, this amount should not have been subtracted from the $1,714,856 in the DCAA audit that was used by DFAS to justify payment in Modification No. P00089.

The difference between the $2.6 million cap and what LMSI was paid in Modification No. P00089 is $1,140,462.56 (findings 15, 23, 27). The sum of the improperly questioned $911,727.00 in original investment cost and improperly excluded $255,319.00 enhancement cost is $1,167,046.00. This amount is greater than the $1,140,462.56 remaining in the $2.6 million cap. Therefore, LMSI has proven its entitlement to the remainder of the capped amount.

## CONCLUSION

LMSI's appeals in ASBCA Nos. 58028 and 58794 are sustained in the amount of $1,140,462.56 with CDA interest running from 19 July 2011 the date its certified claim was submitted to the CO.

Dated: 8 December 2015

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58028, 58794, Appeals of Lockheed Martin Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
