# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Edinburgh International ) | ASBCA No. 58864 |
| ) | |
| Under Contract No. W91B4K-09-D-0002 ) | |

APPEARANCE FOR THE APPELLANT:      Armani Vadiee, Esq.
                                       Smith Pachter McWhorter PLC
                                       Tysons Corner, VA

APPEARANCE FOR THE GOVERNMENT:      E. Michael Chiaparas, Esq.
                                         DCMA Chief Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE THRASHER

This appeal concerns a task order under the parties' indefinite-delivery, indefinite-quantity (IDIQ) contract for provision of security services at various facilities throughout Afghanistan. Appellant seeks an upward price adjustment of $164,485 for the cost of billeting security personnel during performance of the task order. We have jurisdiction over this matter pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties elected to waive a hearing and submit their cases on the record under Board Rule 11.

## FINDINGS OF FACT

1. On 22 May 2009, Edinburgh International (EI)[1] was awarded Contract No. W91B4K-09-D-0002 (IDIQ contract), an IDIQ commercial contract to perform base security functions at Forward Operating Bases (FOBs) and facilities, which were to be specified in individual task orders, throughout the Task Force Duke Area of Operations located in the provinces of Nangarhar, Nuristan, Kunar, and Laghman (N2KL) provinces of Afghanistan (R4, tab 1 at G-42). A total of three contracts were awarded as a result of the solicitation for these services (R4, tab 1 at G-3, tab 65). The IDIQ contract was for a base year beginning 1 July 2009 through 30 June 2010 and included four option years (R4, tab 1).

2. The IDIQ contract provides that the "[c]ontractor shall provide all labor, weapons, ammunition...and other operational equipment to perform facility protective services as defined in each individual task order" (R4, tab 1 at G-6). The statement of work also provides that the contractor shall "utiliz[e] indigenous personnel from the

---

[1] Edinburgh International is the trading name of the ERSM Limited group of companies (R4, tab 12).

area surrounding the performance location [to] provide internal security for each location as specified in individual task orders" (R4, tab 1 at G-43).

3. On 25 July 2010, Solicitation No. W91B4L-10-R-0230 was released seeking quotes for a contractor to provide "all labor, tools, materials, equipment, personnel and all other services required to provide...: PRIVATE SECURITY CONTRACTOR (PSC) SERVICES" at COB Blackhawk Vehicle Holding Area (VHA Blackhawk) in Kandahar Province, Spin Boldak, Afghanistan (R4, tab 61 at G-415, tab 62). The solicitation notice provided:

> This is [a] firm-fixed price procurement and will be procured using commercial item procedures and award selection will be made based on lowest price, technically acceptable.

(R4, tab 61 at G-415)  Quotes were due no later than 2 August 2010 (R4, tab 63 at G-504).

4. On 13 August 2010, U.S. CENTCOM Contracting Command, sent an email with the subject line, "Request for Quote" to the three contractors under the IDIQ contract (R4, tab 65; app. reply br., ex. 1, (Smith decl.) ¶ 3). The email stated, in part:

> This will be awarded to the LPTA vendor under their IDIQ award.  So it will be a TO off your IDIQ if awarded. Closing for this RFQ is 19 1200 AUG 10.  Please ensure that your quote is broken down into CLINS.  Below is the minimum that I need, you may break it down more if you want to.
>
> 0001   ASG Guards
> 0002   DBA Insurance
> 0003   Compound Establishment/Mobilization Costs
>
> I also need to know the mobilization time for this requirement. We require services to be in place NLT 15 SEP 10.

(R4, tab 65)  The email included an attachment entitled "STATEMENT OF WORK (COB Blackhawk)."  The statement of work document was not included in the appeal record.  The parties both reference the language of Solicitation No. W91B4L-10-R-0230 in their briefs when discussing the clauses of the RFQ.  However, EI did not respond to the solicitation (Smith decl. ¶ 3), and appellant's personnel's declarations stated that the statement of work emailed to the IDIQ contractors did not include any of the typical clauses found in solicitations such as the site visit clause (Smith decl. ¶ 3; app. reply br., ex. 2, (Donohue decl.) ¶ 4).  The solicitation released on 25 July 2010 did include FAR

clauses (R4, tab 62). We find that the statement of work emailed to the IDIQ contractors was not the same as the solicitation.

5. By email dated 17 August 2010, EI submitted a request for clarification with respect to a few task order solicitations. The email stated, in part:

> 1. Camp Nathan Smith, COB Blackhawk: The SOWs state that there will be no life support requirements on either contract.
>
> Please confirm that ASG [Afghan Security Guards] are expected to travel from their homes to the site for each work shift?

(R4, tab 7)

6. The contracting officer (CO) responded by email on 18 August 2010. He stated:

> Yes, ASG are expected to travel from their homes to the site for each work shift. Only the Site Coordinator and Site Commander will be provide[d] life support on the FOB. (Government billeting and DFAC)

(R4, tab 7)

7. EI submitted a proposal in response to the emailed request for quote. The technical proposal stated, in pertinent part:

> BILLETING
>
> The Offeror notes that billeting will be provided by the Government for the Expatriate Security Coordinator and Site Commander. The Offeror works to the assumption that daily travel is possible for the Afghan Guards. Should the security system deteriorate to a point where daily travel is not possible, Offeror would seek a modification to provide for billeting.

(R4, tab 68 at G-528)

8. EI was awarded Task Order No. 3D01, on 8 September 2010 (R4, tab 9). The front sheet of the task order award marks Box 28, which provides:

CONTRACTOR IS REQUIRED TO SIGN THIS
DOCUMENT AND RETURN 1 COPIES TO ISSUING
OFFICE. CONTRACTOR AGREES TO FURNISH AND
DELIVER ALL ITEMS SET FORTH OR OTHERWISE
IDENTIFIED ABOVE AND ON ANY ADDITIONAL
SHEETS SUBJECT TO THE TERMS AND
CONDITIONS SPECIFIED HEREIN.

REF: Quote provided on 19 Aug 10[.]

(R4, tab 9)

9. The task order requires EI to provide 68 total personnel, including 1 security coordinator, 1 site commander, 3 shift commanders, 3 communication specialists and 60 security guards for 12 months plus one 6-month option (R4, tab 9 at G-93-94, 99). The contract line item numbers (CLINs) for private security contract services and mobilization costs are firm-fixed-price CLINs. Only the CLINs for DBA insurance are marked as cost CLINs with the actual amount to be determined based upon the amount of the Rutherford invoice. (R4, tab 9 at G-93-95)

10. Of particular importance to this dispute, the task order includes terms addressing the recruitment and maintenance of security personnel. The task order provides:

11. **ACCOMODATION AND MEALS:**

11.1. The Government will not provide a billeting area at the VHA. There will be no billeting requirements for this contract for any security personnel.

11.2. The Government will provide an RLB in the VHA for office space for command and control during the length of the contract. Contractor will be responsible for maintaining the office buildings....

11.3. The Government will not provide meals for security personnel. The Contractor is responsible for providing all meals to the security personnel....

11.4. The government will provide bottled water.

11.5. The government will provide adequate latrine service.

....

4

### 16.3 RECRUITING, HIRING AND STAFFING PROCEDURES

The Contractor should maximize the employment of current guards at each location. To do so, the Contractor shall give the right of first refusal to at least 75% of the current local PSC workforce. In addition, the Contractor is encouraged to hire a minimum 75% of its guard force from within a 50 kilometer radius of the location requiring security.

(R4, tab 9 at G-105, -107) LTC Mote was the CO for the Kandahar region and was responsible for reviewing EI's proposal (gov't br., ex. 1, (Mote decl.) ¶¶ 2-3). However, he did not sign the contract because the contract exceeded his warrant (Mote decl. ¶ 4). According to the declaration of LTC Mote, "the parties to the contract understood that Edinburgh would hire guards from the local population, with the exception of supervisory personnel" and that EI's guards "would travel to and from the worksite each day" (Mote decl. ¶¶ 5-6). This is consistent with the assumption provided in EI's proposal (finding 7). Accordingly, we find that at the time of contract award, the parties thought that security personnel would be able to travel from their homes to work.

11. During the beginning phase of contract performance, EI experienced difficulties in recruiting local Afghanis to serve as security personnel. EI determined that local personnel could not be recruited unless EI bribed the local leader of the Afghan National Border Police (ANBP), a colonel, who policed local roads. Hiring of local guards without the colonel's approval would have placed personnel in danger of extortion or physical harm from the ANBP. (R4, tab 78; Smith decl. ¶¶ 7-8) EI determined that working with the community leaders would put EI in breach of other terms of the task order and U.S. law (R4, tab 78).

12. Apparently, due to concerns about the colonel's actions, EI chose to pursue the billeting of security personnel on base (Smith decl. ¶¶ 11, 13; Donohue decl. ¶ 11). In October 2010, EI began discussions with the COR and the Force Protection Officer, CPT McMorris, about potential areas where EI could house the guard force it was hiring from outside the local population (gov't br., ex. 3, (McMorris decl.) ¶ 6). By email dated 25 October 2010, CPT McMorris requested a status update regarding how EI intended to proceed with staffing the task order. He stated:

> What is EI doing regarding housing for guards for VHA?
> Are you renting some land off VHA?
>
> Here is the Course of Actions that we see:
>
> COA 1 – EI renting lodging area somewhere in vicinity

COA 2 – EI buys tents and puts in VHA

COA 3 – EI buys generator, AC unit and US Gov finds a tent (we have discuss[ed] this and see if it is even possible). I am going to run this by contracting and SJA.

Ideas?

Lets pick a COA and get it done. COA 3 is not promised, it is an option we can look at with legal and contracting if everyone wants that option.

EI responded:

As per our initial meeting when we discuss[ed] setting up the man camp for the ASG. I believe I inform[ed] you then that it wasn't included in the contract but I agreed it was a good idea that we keep most of the ASG on site to ensure they are they [sic] for work. I informed our international office in Dubai of change and received this reply[:]

"If guards are to stay on the FOB/VHA, that definitely requires a contract mod. The SOW specifically required that the guard force could not stay on the site – this is very unusual, but we clarified it with the contracting officer and they stuck to it so if this changes we have to have a chance to price it in..."

I informed David Bernier of this to inform the COR and he said that the Army wasn't willing to modify the contract.

We are willing to do this, however, there is a cost involved that we have to add to the contract.

(R4, tab 76)

13. EI recruited security personnel from outside the local population to work at VHA Blackhawk (Donohue decl. ¶ 11; Ramirez decl. ¶ 4). EI was also able to recruit some local residents to work as security personnel (Smith decl. ¶ 13). EI set up tents in VHA Blackhawk to house its security personnel (gov't br., ex. 2 (Deering decl.) ¶ 6). All security personnel, whether local or not, were billeted at VHA Blackhawk in the tents set up by EI (Smith decl. ¶ 13).

14. EI submitted a modification proposal to the CO on 28 December 2010 stating "As you know, the rollout of the services at VHA Blackhawk has been very challenging for a number of reasons.... We have developed the attached proposal to address these problems." (R4, tab 79) The proposal provided, in pertinent part:

> Since [the task order] award, a number of planning factors have changed that have rendered the Government's original concept of operations, as expressed in the Statement of Work, untenable. Edinburgh International seeks a modification to the task order, to take into account factors that were not accounted for in the original Statement of Work (SOW).
>
> ....
>
> **2. Local labor monopoly and corrupt hiring practices for local staff.** The undue influence of certain Afghan security forces personnel in Spin Boldak means there is an effective monopoly on local labor....
>
> ....
>
> **4. EI proposed solution:** Add recruits from outside the immediate site area to reduce undue influence on the guard force, while also paying higher rates to attract reliable labor force.
>
> ....
>
> **7. Requirement to provide a Life Support Area (LSA) for guards on the VHA site.** The SOW (section 11.1) specifically stated that no billeting would be required or allowed on the VHA site. Due to the employment of guards from outside of the local area, it is clear that the concept of security guards returning to their homes while off duty is not workable at this site. The distance to travel would significantly detract from the ability to reinforce the guards on duty and repel a determined attack on the site. Therefore a secure LSA must be provided, meeting the standards of the US Army Sandbook and the other standards contained within the SOW. Such a facility will require a full suite of living and eating quarters, storage, and laundry and ablution facilities.

*Note: Due to the urgency of the requirement EI has already begun procuring life support facilities and equipment. EI has undertaken this 'at risk' since the existing contract does not provide for such facilities.*

....

14. ...The changes proposed in this modification will enhance the security of the site by reducing the negative influence of external personnel and providing an independent, committed and capable guard force with expatriate supervision to ensure the highest standards.

(R4, tab 12 at G-158-60)

15. By email dated 20 July 2011 the administrative contracting officer (ACO) requested background and documentation concerning EI's alleged out-of-scope work (R4, tab 29). EI responded by email dated 21 July 2011. EI's response was largely a reiteration of its earlier accounts but added that upon realizing that "having guards live off site was totally unworkable[, the COR] insisted that the contractor was to provide a life support area." (R4, tab 30)

16. Earlier, Command decided to close VHA Blackhawk. EI was notified of the decision by email dated 9 July 2011. (R4, tab 24) Accordingly, the CO determined that he would not exercise the option of EI's task order (R4, tabs 24, 26).

17. EI submitted a "request for an adjustment upon the closeout of the VHA Blackhawk contract" to the ACO by email dated 27 September 2011. The request sought the following closedown price adjustments:

| Item | Cost |
|------|------|
| Mobilization | $ 4,447.94 |
| Life Support Equipment | $131,741.46 |
| Life Support | $ 14,936.78 |
| Material Resupply | $ 13,359.67 |
| **Total** | **$164,485.85** |

**Mobilization Costs** include the costs of mobilizing the additional necessary Life Support items that were not included in the original price proposal.

**Life Support Equipment** includes items such as tents, bedding, showers and latrines, HVAC, generator, and other costs incurred in the establishment of the life support area.

8

**Life Support Costs** are the daily operational costs incurred to provide life support to the guard force and includes costs such as food and fuel for cooking, potable and non-potable water supply.

**Material Resupply Costs** include costs such as maintenance of the generator, black and grey water removal, and septic services.

(R4, tab 39 at G-316, -328)

18. The government denied EI's request by letter dated 23 December 2011 (R4, tab 45).

19. EI resubmitted its request as a certified claim in the amount of $164,485.85 by letter dated 22 March 2012 (R4, tab 47). The CO acknowledged receipt of the claim the same day (R4, tab 102).

20. EI filed a notice of appeal from the deemed denial of its claim with the Board on 6 September 2013.

## DECISION

Appellant argues that EI had a "contractual right to a price adjustment in the event that guards provided under the contract could not reside at their private homes and commute to VHA Blackhawk on a daily basis" (app. reply br. at 1), and that, therefore, the government's failure to provide a contract modification to adjust the contract price constituted a breach of the contract by the government (app. br. at 9-11). The government argues that the language of the contract "does not reflect a Government agreement to compensate [EI] for any future billeting costs [it] might incur" (gov't reply br. at 2).

To recover on a breach of contract theory, appellant must show (1) that the government owed appellant a contract duty, (2) that the government breached that duty and caused damage to appellant, and (3) that the damage was reasonably foreseeable at the time of contract award. *TRS Research*, ASBCA No. 51712, 01-1 BCA ¶ 31,149 at 153,874. "Appellant bears the burden of proving its claims by a preponderance of the evidence." *M.A. Mortenson Co.*, ASBCA No. 53105 *et al.*, 04-2 BCA ¶ 32,713 at 161,845.

At the core of the parties' dispute is a question of contract interpretation concerning whether the government owed appellant a contract duty to provide a price adjustment for billeting costs. "Contract interpretation begins with the plain language of the written agreement." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir.

9

2002). "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "In determining the rights and obligations of the parties, we look to the entire contract and, if necessary, to evidence extrinsic to the contract itself, including the facts and circumstances surrounding the formation and performance of the contract." *TRW, Inc.*, ASBCA Nos. 27299, 27602, 87-3 BCA ¶ 19,964 at 101,071. We accord considerable weight to the parties' contemporaneous mutual understanding of how the contract was to work. *CI², Inc.*, ASBCA Nos. 56257, 56337, 14-1 BCA ¶ 35,698 at 174,781.

Examining the plain language of the task order, we conclude that the billeting of security personnel was outside the scope of work of the task order. The task order provides:

> 11.1  The Government will not provide a billeting area at the VHA. There will be no billeting requirements for this contract for any security personnel.

(Finding 10) The first sentence concerns only the government and provides that the government will not provide space at VHA Blackhawk to set up billeting for security personnel. The second sentence states simply that there is no billeting requirement. This is reasonably read to provide that neither the government nor appellant is required to provide billeting for security personnel.

Further examination of the pertinent language in the context of the task order as a whole, and the parties' discussions during contract formation, supports our interpretation that billeting was outside the task order's scope of work. Billeting is addressed in section 11 of the task order, entitled Accommodation and Meals (finding 10). This section establishes which party to the contract will be responsible for various aspects of support for security personnel. Save for the second sentence of clause 11.1, quoted above, each sentence of section 11 specifically identifies one party or the other (*see, e.g.*, finding 10 ("The Government will not provide meals for security personnel. The Contractor is responsible for providing all meals to the security personnel.")). The unique construction of the second sentence of clause 11.1, in the context of the rest of section 11, further supports our interpretation that the "no billeting requirements" language applies to both contracting parties. This interpretation is also consistent with the parties' exchange during contract formation, describing that "ASG are expected to travel from their homes to the site for each work shift" (findings 5-6). In this full context, the only reasonable interpretation of clause 11.1 is that billeting of security personnel by either contracting party was not contemplated by the task order.

During contract performance, however, EI encountered interference of a third party, the colonel who led the ANBP (finding 11). Due to the influence of the colonel over the local population, EI was unable to perform the contract in the manner it had

originally anticipated (*see* findings 10-11). EI recruited security personnel from outside the local population, which meant that personnel could not return to their homes while off duty (findings 11, 13). Accordingly, despite the contract terms, EI set up tents within VHA Blackhawk where all security personnel were billeted (finding 13). This action was taken by EI without a contract modification, and there is no evidence that the CO directed EI to billet its security personnel at VHA Blackhawk (*see* findings 12, 14-15).

The question now before the Board is how did the contract allocate the risk of performance of the out-of-scope billeting services.[2] There is no question that the task order is a fixed-price contract (findings 4, 9). It is well settled that "the risk of increased performance costs in a firm-fixed-price contract, absent a clause stating otherwise, are on the contractor." *Chevron U.S.A., Inc.*, ASBCA No. 32323, 90-1 BCA ¶ 22,602 at 113,426; *see also United States v. Spearin*, 248 U.S. 132, 136 (1918) ("Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered."). Everything points to appellant bearing the risk of these increased performance costs unless some other language in the contract shifted the risk of billeting to the government.

The task order incorporates, by reference, appellant's proposal (finding 8). Appellant argues that the language of its proposal did shift the risk of billeting costs from appellant to the government (app. br. at 10-11). Appellant's proposal provides:

> BILLETING
>
> The Offeror notes that billeting will be provided by the Government for the Expatriate Security Coordinator and Site Commander. The Offeror works to the assumption that daily travel is possible for the Afghan Guards. Should the security system deteriorate to a point where daily travel is not possible, Offeror would seek a modification to provide for billeting.

(Finding 7)

We do not find that this language can reasonably be read to shift the risk of increased performance costs for billeting from appellant to the government. Notably the language does not state that EI is entitled to a price adjustment if billeting is required. Rather it states that appellant would seek a modification if the circumstances on the ground were different than appellant had anticipated. Contractors are always entitled to seek a modification. Declaring an intention to seek a modification is not the

---

[2] There is no evidence that EI ever declared the contract impossible of performance and of course the government did not terminate the contract for default.

same as establishing that the government will be liable for additional costs of billeting should the parties' assumption about how the contract is to be performed be incorrect. The language, written by appellant, does not establish that the government is liable for additional performance costs incurred by EI's billeting of security personnel.

Appellant entered into a fixed-price task order with the government, where recruitment and maintenance of security personnel was EI's responsibility and it bore the risk of increased performance costs resulting from the performance of these contractual responsibilities. There is nothing in the contract that convinces us that this risk was shifted to the government.

## CONCLUSION

The government did not owe appellant a contractual duty to pay for the cost of billeting security personnel at VHA Blackhawk under the task order. Therefore, the government did not breach the contract by not agreeing to a price adjustment for the additional costs of billeting security personnel. Accordingly, the appeal is denied.

Dated: 11 January 2016

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals


I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58864, Appeal of ERSM Limited, d/b/a Edinburgh International, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals